UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LORI CLANTON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 17 C 8862 |
| ) | |
| MIDLAND FUNDING, LLC and ) | Judge Rebecca R. Pallmeyer |
| MIDLAND CREDIT MANAGEMENT, INC., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Lori Clanton brings this case under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *eq seq.* (the "FDCPA"), and the Illinois Collection Agency Act, 225 ILCS 425, *et seq.* (the "ICAA"), alleging that Defendants Midland Credit Management, Inc. ("MCM") and Midland Funding, LLC ("MF") submitted false information about Clanton's debt to a credit reporting agency. The parties have filed cross-motions for partial summary judgment. Clanton contends that Defendants' undisputed conduct violated the FDCPA, and believes that she is therefore entitled to judgment as a matter of law on the FDCPA claim. Defendants dispute that their conduct constituted an FDCPA violation, and further observe that the ICAA does not create a private right of action. As explained below, the parties' motions are granted in part and denied in part.

## STATEMENT OF FACTS

### I. MCM and MF

MF characterizes itself as a "debt buyer": it purchases debt, which it then assigns to MCM for servicing and collection. (Defs.' 56.1 [56] ¶ 49.) MF holds a collection agency license from the State of Illinois, but "does not collect on the accounts that it purchases and owns," and has "no employees or interaction with any consumers." (Pl.'s 56.1 [40] ¶ 6; Ross Decl. ¶¶ 4-5, Ex. K to

Defs.' 56.1.) A "Senior Group Manager" at MCM, Sandra Ross, avers that all consumer-facing activities, such as collection efforts, are performed by MCM. (Ross Decl. ¶ 5.)[1]

MCM, and particularly its "Consumer Support Services" department, investigates and responds to consumer disputes and addresses credit reporting issues. (Defs. 56.1 ¶ 26.) MCM's "Consumer Dispute Policy" addresses identifying, investigating, recording, and responding to customer disputes. (*Id.* ¶ 27.) And its "Credit Bureau Reporting Policy" governs the process by which MCM relays account information to credit agencies. (*Id.* ¶ 28.) MCM provides copies of these polices to its employees, and trains its employees in adhering to them. (*Id.* ¶ 29.)

In a sample four-month period in 2018, MCM received 152,844 disputes on approximately 24 million accounts. (*Id.* ¶ 38.) MCM's Consumer Dispute Policy requires it to respond to each dispute, and communicate the dispute's existence to credit agencies, within 30 days. (*Id.* ¶ 24.) Upon receiving a customer dispute, MCM's first step is to update its internal records to reflect that the account is disputed. (*Id.* ¶ 30.) It thereafter communicates the fact that an account is disputed to credit reporting agencies through a bi-monthly process hereinafter referred to as the "Credit Reporting Cycle." (*Id.* ¶¶ 19-20, 33, 35.)

MCM initiates a Credit Reporting Cycle twice each month, on the Monday following the first and third Sunday of the month. (*Id.* ¶ 19-20.) The process begins in the morning, when MCM automatically pulls data from its accounts, creates a list of accounts to be reported, and then adds a code to each disputed account to mark that they are, indeed, disputed. (*Id.* ¶ 19.) Once this process is complete, the list becomes, in MCM's characterization, "finalized." (*Id.*) After this step, but before MCM forwards the list to credit agencies, MCM executes "quality control checks" to

---

[1] Clanton contests that MF's role is so limited, citing to a 35-page excerpt of a Form 10-K Annual Report filed by Encore Capital Group, Inc. (*See, e.g.*, Pl.'s 56.1 ¶ 23; Pl.'s Resp. Defs.' 56.1 [72] ¶¶ 39, 40, 41, 52.) Clanton alleges that this excerpt shows that MF "derives all of its revenue from purchasing and recovering portfolios of defaulted receivables from consumers." (Pl.'s MSJ [39] at 13.) But this lengthy excerpt does not appear to mention MCM or MF, and Clanton fails to explain how it substantiates her claim. (*See* Form 10-K, Ex. K to Pl.'s 56.1.)

ensure the data is accurate and free of duplicates. (*Id.* ¶ 21.) Then, on Friday of the same week, MCM sends the list to three major credit reporting agencies. (*Id.* ¶¶ 22, 35.) A typical list includes over 6 million unique accounts, not all of which are disputed. (*Id.* ¶¶ 36-37.)

### III. Plaintiff's Dispute

In 2016, Plaintiff Lori Clanton made purchases on a credit card issued by Synchrony Bank ("Synchrony"). (Defs.' 56.1 ¶ 1.) Clanton missed payments on the card and, in doing so, incurred some amount of debt to Synchrony. (*Id.* ¶ 5.) On August 28, 2017, Clanton entered into a payment plan with MF to pay off this debt. (*Id.* ¶ 6.) The rights to Clanton's debt were assigned to MF, and her account was referred to MCM for servicing. (Defs.' Resp. Pl.'s 56.1 [56] ¶ 10.)[2] MF never contacted Clanton itself, and there is no evidence it ever reported information about Clanton's account to credit agencies. (Defs.' 56.1 ¶¶ 43-47.)

At some point after entering into the payment plan, Clanton retained counsel. (Defs.' 56.1 ¶ 10.) On Friday, November 17, 2017, Clanton's lawyers faxed MCM a letter stating, in part, that "the debt reported on [Clanton's] credit report is not accurate." (*Id.*; Pl.'s 56.1 ¶ 14.) The following Wednesday, November 22, 2017, MCM processed Clanton's letter and updated its system to reflect that Clanton's debt was disputed. (Defs.' 56.1 ¶¶ 18, 50.)[3] This day fell in the middle of a Credit Reporting Cycle—two days after MCM had finalized a list, but two days before it sent that list to credit bureaus. (*Id.* ¶ 22.) MCM did not immediately update the list to reflect Clanton's dispute. (*Id.*) And on Monday, November 27, 2017, MCM communicated information regarding

---

[2] For reasons that are unknown to the court, Defendants dispute that they "purchased" the debt. (Defs.' Resp. Pl.'s 56.1 [56] ¶ 10.) It is uncontested, however, that MF was "assigned all rights to [the] Synchrony Bank account in Plaintiff's name." (*Id.*)

[3] Although Defendants contend (and Plaintiff does not dispute) that MCM processed the dispute letter "after one full business day, on [the] evening [of] Tuesday November 22, 2017," this court's review of a calendar reveals that November 22, 2017 was, in fact, a Wednesday. Given that Defendants' cited evidence asserts only that the letter was processed on November 22, 2017, the court finds that this is the accurate date. (*See* Ross Dep at 21, Ex. F to Defs.' 56.1.) Thus, the dispute letter was actually processed five days—or, following Defendants' framing, two full business days—after it was sent.

Clanton's alleged debt to TransUnion, a consumer reporting agency, without relaying that the debt was disputed. (Pl.'s 56.1 ¶¶ 16-17.) As of December 2, 2017, Clanton's TransUnion credit report still did not reflect that she disputed her debt. (*Id.* ¶ 17.) It was not until the end of the following reporting cycle, on Friday, December 8, 2017, that MCM first reported to credit bureaus that Clanton's account was disputed. (Defs.' 56.1 ¶ 23.) By this point, three weeks had passed since Clanton faxed in her dispute letter.

In her declaration, Clanton states that as a result of the error in her TransUnion credit report, she has "suffered stress, aggravation, confusion and humiliation." (Clanton Decl. ¶ 8, Ex. B to Pl.'s 56.1.) When asked at her deposition, however, what MCM and MF did that made her "feel harmed," Clanton responded only that MCM and MF had communicated inaccurate information to her over the phone, without specifying what information was inaccurate. (Defs.' 56.1 ¶ 17; Pl.'s Dep. at 69-70, Ex. B to Defs.' 56.1.) She described her emotional distress as "stress" and a "short temper," which she has been experiencing for "a couple of years." (Pl.'s Dep. at 71-72.) Clanton testified that other debt collection activity, unrelated to MF and MCM, caused her to experience a short temper, as well, and stated that she could not explain the difference in stress she experienced in this case as compared to other cases. (*Id.* at 71-73.) No other witness has corroborated Clanton's claim that she suffered actual damages, and it is undisputed that Clanton did not seek treatment for emotional distress in 2017. (Defs.' 56.1 ¶¶ 59-60.)

**III.     Facts Related to Unclean Hands Defense**

Defendants have raised the defense of "unclean hands," and offer, as support, evidence of the conduct of Clanton's lawyers—specifically, their communications, on Clanton's behalf, of which she had no apparent knowledge: With regard to the dispute letter sent to MCM in November 2017, Clanton testified at her September 2018 deposition that she had not previously seen the letter, and did not know why her lawyers sent it. (Defs.' 56.1 ¶¶ 11-12.) Although Clanton has disputed accounts with three other debt collectors, during her deposition she did not

4

remember when she disputed one of the accounts, and did not remember the second dispute at all. (*Id.* ¶ 61-62.) Clanton's lawyers sent identical dispute letters to MCM on behalf of 23 other individuals during a 10-month stretch of time, in each instance leading to a lawsuit. (*Id.* ¶ 16.) Clanton did not send a similar letter to Synchrony or to any credit bureau. (*Id.* ¶ 9.)

When asked why she filed this lawsuit, Clanton testified only that she was following her attorney's advice. (Pl.'s Dep. at 26.) When asked what she hoped to achieve by filing the lawsuit, Clanton testified, "I don't know," then clarified that she hoped her lawyers would "have this rectified." (*Id.* at 27-28.) As of the date of her deposition, Clanton was not aware that her debt with MCM was ultimately marked disputed on December 8, 2017. (Defs.' 56.1 ¶ 14.)

### IV.    Procedural Posture

On December 8, 2017, Clanton filed a Complaint [1] in this court, alleging that Defendants violated the FDCPA and the ICAA. The Complaint requests actual damages pursuant to 15 U.S.C. § 1692k(a)(1), statutory damages pursuant to 15 U.S.C. § 1692k(a)(2), costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1692k(A)(3), and similar damages under the ICAA. (Complaint [1] ¶¶ 39, 41.) Neither of the Defendants moved to dismiss, and the parties proceeded with discovery. On October 29, 2018, Clanton moved for summary judgment [38] on her FDCPA claim, arguing that Defendants' undisputed conduct amounted to an FDCPA violation. On December 17, 2017, Defendants responded with their own, joint motion for summary judgment [55] on Clanton's FDCPA claim, arguing that MF's conduct is not governed by the FDCPA, that MCM's conduct does not amount to an FDCPA violation, and that Defendants have established multiple affirmative defenses as a matter of law. Defendants also move for summary judgment on Clanton's ICAA claim, observing that the ICAA does not create a private right of action.

### DISCUSSION

"Summary judgment is the 'put up or shut up' moment in a lawsuit." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 936 (7th Cir. 2010) (quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir.2003)). It is appropriate only where the moving party shows that there is "no genuine

5

dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Where, as here, parties file cross-motions for summary judgment, the court "take[s] the motions one at a time and then, as usual, construe[s] all facts and draw[s] all inferences in favor of the non-moving party." *Advance Cable Co. v. Cincinnati Ins. Co.*, 788 F.3d 743, 746 (7th Cir. 2015).

**I.    The FDCPA Claim**

Section 1692e(2)(A) of the FDCPA prohibits "debt collector[s]" from "[c]ommunicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed." 15 U.S.C. § 1692e(8). As a threshold issue, MF argues that it cannot be liable under this section because it does not qualify as a debt collector under the FDCPA. Both Defendants argue, further, that their conduct did not violate Section 1692e(8) and, in the alternative, assert affirmative defenses of bona fide error and unclean hands. Finally, Defendants contend that the record does not support Clanton's request for actual damages. The court addresses these arguments in turn.

**A.    MF's "Debt Collector" Argument**

The FDCPA holds debt collectors vicariously liable for communications made on their behalf. *See Janetos v. Fulton Friedman & Gullace, LLP*, 825 F.3d 317, 325 (7th Cir. 2016). Thus, although there may not be evidence that MF itself violated Section 1692e(2)(A), if MF is a "debt collector," it could be found liable for MCM's conduct. The FDCPA defines a debt collector as "any person . . . in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or asserted to be owed or due another." 15 U.S.C. § 1692a.[4] This definition "establishes two categories of debt

---

[4] The FDCPA also contains a second, limited-purpose definition of debt collector, which applies to claims brought under 15 U.S.C. § 1692f(6), and "also includes any person . . . in any business the principal purpose of which is the enforcement of security interests." 15 U.S.C. § 1692. Because Clanton's claim is not brought under Section 1692f(6), this definition is not operative here.

6

collectors: (1) those whose "principal purpose . . . is the collection of any debts," and (2) those who 'regularly collect[ ] or attempt[ ] to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.'" *Schlaf v. Safeguard Prop., LLC*, 899 F.3d 459, 466 (7th Cir. 2018) (quoting *McCready v. eBay, Inc.*, 453 F.3d 882, 888–89 (7th Cir. 2006)). Clanton argues that MF belongs to both categories; the court addresses those arguments below.

### 1. Principal Purpose

Clanton first contends that MF is a debt collector under the "principal purpose" definition, offering several alternate arguments in support of this categorization. She begins by asserting that MF's status as a registered debt collection agency is *per se* evidence that its principal purpose is debt collection, citing *Evans v. Portfolio Recovery Assocs.*, LLC, No. 15 C 4498, 2016 WL 6833930 (N.D. Ill. Nov. 20, 2016), *aff'd on other grounds*, 889 F.3d 337 (7th Cir. 2018). *Evans* does not, however, support Clanton's contention that an entity's registration as a collection agency is a dispositive factor. In *Evans*, defendant Portfolio Recovery Associates, LLC ("PLA") argued it was not a debt collector and therefore could not be found liable for violating FDCPA. *Id.* at *1. In rejecting that argument, the *Evans* court did note that PLA was licensed as a collection agency, but more significantly, pointed out that PLA had already admitted in its answer that it "acts as a 'debt collector' as defined by the FDCPA." *Id.* at *2. The court did not consider whether, absent such an admission, an entity's licensure would constitute evidence of its principal purpose under the FDCPA.

*Torres v. LVNV Funding, LLC* is also distinguishable. No. 16 C 6665, 2018 WL 1508535 (N.D. Ill. Mar. 27, 2018). One of the defendants in *Torres*, LVNV Funding, LLC ("LVNV"), purchased already-defaulted debt which it hired servicers to collect. *Id.* at *5. On the parties'

---

The Supreme Court recently held, in *Obduskey v. McCarthy & Holthus LLP*, that the limited-purpose definition functions to exclude certain individuals—"those who engage in only nonjudicial foreclosure proceedings"—from the primary definition's purview. 139 S. Ct. 1029, 1038 (2019). Although Defendants have filed supplemental authority since *Obduskey* was decided, they have not sought to argue that the carve-out announced in *Obduskey* extends to them. Accordingly, the court deems any such argument waived.

7

cross motions for summary judgment, LVNV conceded that through those servicers it was "attempting to collect [the plaintiff's] debt for its own account," but argued that the collection of debt already in default at the time LVNV purchased it is not covered by Section 1692(a)(6) of the FDCPA. *Id.* at *4-5. Rejecting this argument, and noting that the fact that "LVNV sought to collect a debt" was "undisputed," the court granted summary judgment for the plaintiff. *Id.* at *5. The *Torres* court, like the *Evans* court, did not consider the issue here: whether an entity that purchases debt, yet does *not* admit to engaging in any conduct to collect on that debt, is a debt collector under the "principal purpose" definition of Section 1692(a)(6).

Clanton further insists that MF meets the principal purpose definition because MF "derives all of its revenue from purchasing and recovering portfolios of defaulted receivables from consumers." (Pl.'s MSJ at 13.) But the only evidence Clanton cites for this factual allegation is a 35-page excerpt of a Form 10-K filed by "Encore Capital Group." The Form 10-K makes no mention of MF or MCM, and Defendants dispute that it constitutes evidence of MF's revenue. (Defs.' 56.1 Resp. ¶ 23.) The court agrees that there is no evidence in the record from which a rational trier of fact could determine that MF's principal source of revenue is the collection of debts. Clanton has not marshaled adequate evidence to prove that MF is a debt collector under the first definition.

### 2. Collection Activity

Clanton next argues that MF is a debt collector under the "regularly collects" definition because it engages, Clanton contends, in "direct collection activity." (Pl.'s MF Reply [71] at 4.) Clanton appears to concede, however, that neither purchasing debt, nor assigning another entity to collect on the debt, constitutes collection activity. She first cites *Kasalo v. Trident Asset Mgmt., LLC*, in which the defendants were a debt buyer, OPS, and a servicer it hired, Trident Asset Management ("Trident"). 53 F. Supp. 3d 1072, 1078 (N.D. Ill. 2014). The complaint in *Kasalo* did not allege that OPS had interacted with consumers, or taken any other action related to the debt, other than hire Trident. *Id.* On this basis, OPS argued successfully that it was not a debt

collector. Although it acknowledged that OPS's conduct may have been debt collection "in one literal sense of the term," the court held that OPS did not fit the term as it is used in the FDCPA. *Id.* at 1078-79. It cited the FDCPA's focus—"interactions between debt collectors and consumers"—and its purpose—"'to eliminate abusive debt collection practices by debt collectors'"—in concluding that purchasing debts and hiring another entity to collect on them is not, standing alone, collection activity. *Id.* at 1078 (quoting 15 U.S.C. § 1692(a)). In the *Kasalo* court's view, without any consumer-facing conduct whatsoever, or involvement in Trident's collection efforts, OPS was not a debt collector. *Id.* Accordingly, the court granted summary judgment for OPS.

In *Gold v. Midland Credit Mgmt., Inc.*, which Clanton also cites, a court applied *Kasalo*'s reasoning to a case involving MF itself. 82 F. Supp. 3d 1064, 1072 (N.D. Cal. 2015). In *Gold*, as here, MF moved for summary judgment on the basis that it was not a debt collector under the FDCPA. *Id.* at 1072. Highlighting that there was "nothing in the record to suggest that Midland Funding does anything other than hold the defaulted accounts and refer them to MCM for collection," the court reached the same conclusion as the *Kasalo* court had: that the plaintiff could not make a showing that MF engages in "any collection activity, whether directly or indirectly." *Id.* Having already determined that MF did not qualify under the "principal purpose" prong, the *Gold* court granted summary judgment for MF. *Id.* at 1083.

Clanton cites *Kasalo* and *Gold* approvingly, and seems to accept their conclusion that to "regularly collect" debt under the FDCPA, an entity must engage in some sort of consumer-facing conduct. Unlike the plaintiffs in *Kasalo* and *Gold,* however, Clanton purports to have such evidence in this case: Specifically, Clanton asserts that MF qualifies as a debt collector because it (1) "routinely reports information on debts it has purchased to credit reporting agencies," and (2) files "[l]awsuits to collect on debt." (Pl.'s MF Reply at 5.)

That first argument—that MF reports information to credit agencies—is not supported by record evidence. Defendants cite ample evidence that it is MCM, not MF, which reports

9

information to credit agencies. In disputing this fact, Clanton points only to a copy of her credit report listing MF as an account holder. But that report confirms that MF holds the debt, not that MF reported information regarding that debt. It does not create a material dispute of fact as to whether MF submitted information to credit agencies. Given that Clanton does not dispute that MF has no employees who might facilitate reporting to credit agencies, no reasonable jury could find her evidence on this point persuasive.

Clanton's second argument, regarding litigation activity, fares no better. Again, she has presented no evidence that MF itself brings lawsuits to collect on debt, and did not even include such an assertion in her Rule 56.1 Statement. Clanton instead asks the court to take judicial notice of the Circuit Court of Cook County's electronic docket which, according to Clanton, reflects that MF was a named plaintiff in "over 400 cases filed in September 2017 alone." (Pl.'s MSJ at 8 n.1.) But Clanton does not reference any of these cases by name, nor attach a sample complaint filed by MF, nor even purport to know their subject matter. Instead, she provides only a general link to the website for the Circuit Court of Cook County. This is inadequate at the summary judgment stage, particularly from the party which bears the burden of proof. Even if the court were to take judicial notice that these cases exist, Clanton does not allege that all of these 400 cases were brought to collect on debts. Moreover, if any or all of these lawsuits were brought to collect debts purchased by MF before they were in default, they would not constitute evidence that MF is a debt collector. *See Ruth v. Triumph Partnerships*, 577 F.3d 790, 796 (7th Cir. 2009) ("Where . . . the party seeking to collect a debt did not originate it but instead acquired it from another party, we have held that the party's status under the FDCPA turns on whether the debt was in default at the time it was acquired.") At the summary judgment stage, a plaintiff must "properly support the elements of her claims with specific citations to admissible record evidence." *Packer v. Trustees of Indiana Univ. Sch. of Med.*, 800 F.3d 843, 845 (7th Cir. 2015). Because Clanton failed to do so, MF is entitled to summary judgment on the FDCPA claim.

10

**B.     MCM's Reasonableness Argument**

Unlike MF, co-defendant MCM concedes that it is a debt collector under the FDCPA. MCM argues, however, that its conduct is not proscribed by the FDCPA. Section 1692e(8) of the FDCPA prohibits "[c]ommunicating . . . credit information which is known . . . to be false, including the failure to communicate that a disputed debt is disputed." 15 U.S.C. § 1692e(8). MCM does not contest that on November 27, 2017—more than one week after Clanton sent in her dispute, and five days after the dispute was processed—it communicated information regarding Clanton's alleged debt to a consumer reporting agency without relaying that the debt was disputed. MCM argues, however, that it is freed from liability by an unwritten carve-out for communications made before "a reasonable amount of time" has passed. (MCM's Resp. [64] at 10.) MCM further insists that the length of this supposed grace period tracks a requirement in the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.*, that customer disputes be investigated and responded to within 30 days. *Id.* § 1681i(a)(1)(A). Thus, because MCM reported Clanton's dispute within 30 days, MCM argues it cannot be liable under the FDCPA.

Whatever the practical merits of such an argument may be, the FDCPA neither provides nor incorporates a grace period in which it is legally permissible for debt collectors to report information they know to be false. *See Valenta v. Midland Funding, LLC*, No. 17 C 6609, 2019 WL 1429656, at *4 (N.D. Ill. Mar. 29, 2019) (addressing the same argument, and finding "[t]here is no support for defendants' reasonableness argument in the text of the statute"). In the Seventh Circuit, "the FDCPA is a strict liability statute." *Wahl v. Midland Credit Mgmt., Inc.*, 556 F.3d 643, 646 (7th Cir. 2009). For a false representation to violate Section 1692e of the FDCPA, it need not be the product of recklessness or even negligence; "it need only be false." *Ross v. RJM Acquisitions Funding LLC*, 480 F.3d 493, 495 (7th Cir. 2007).[5] An exception to this rule's strict

---

[5]     One can imagine a situation in which the window of time between the receipt of a dispute and the submission of a report to credit agencies is so narrow that timely compliance with Section 1692e(8) is functionally impossible, rendering liability inappropriate. But Defendants'

11

application exists in cases of bona fide error, an affirmative defense that is written into the text of the FDCPA. *See* 15 U.S.C. § 1692k(c). To the extent Defendants find liability under Section 1692e(8) to be inappropriate as applied to their conduct in this case, they are limited to that defense. On the issue of whether MCM violated Section 1692e(8), however, Clanton is entitled to judgment as a matter of law.

    **C.    Bona Fide Error**

MCM further argues that regardless of whether it violated the FDCPA, it cannot be held liable because it committed a bona fide error. The FDCPA excepts from liability any debt collector that "shows by a preponderance of evidence that [its] violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." 15 U.S.C. 1692k(c). "In order to claim this defense, the burden is on the defendant to show (1) 'that the presumed FDCPA violation was not intentional'; (2) 'that the presumed FDCPA violation resulted from a bona fide error'; and (3) 'that it maintained procedures reasonably adapted to avoid any such error.'" *Evans v. Portfolio Recovery Assocs., LLC*, 889 F.3d 337, 349 (7th Cir. 2018) (quoting *Kort v. Diversified Collection Servs. Inc.*, 394 F.3d 530, 537 (7th Cir. 2005)). The defendant's error, in this context, must have been "an error of *fact*, not an error of law." *Evans*, 889 F.3d at 349. In other words, as the Supreme Court held in *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, the bona fide error defense "does not apply to a violation of the FDCPA resulting from a debt collector's incorrect interpretation of the requirements of that statute." 559 U.S. 573, 604-05 (2010).

In *Jerman*, a debt collector had sent out a notice to a consumer stating that the consumer's debt was presumed valid unless disputed in writing. *Id.* at 579. The consumer sued, arguing that Section 1692g of the FDCPA (not relevant to this case) prohibited the imposition of an "in writing" requirement. *Id.* At the time, courts were split on whether Section 1692g, in fact, included this

---

admission that they finished processing Clanton's dispute days before sending a report to TransUnion discloses the viability of any "impossibility" argument here.

prohibition. *Id.* Citing the circuit split on the issue, the debt collector argued that even if its letter imposing the "in writing" requirement on consumers violated Section 1692g, its decision to do so qualified as a bona fide error under Section 1692k(c), shielding it from liability. *Id.* The Supreme Court disagreed, holding that the text of Section 1692k(c), as well as "the context and history of the FDCPA," support "construing that [Section 1692k(c)] not to shield violations resulting from misinterpretations of the requirements of the Act." *Id.* at 587. Rather, the Court held, the bona fide error defense focuses on procedures "that help avoid errors like clerical are factual mistakes," and does not extend to errors of legal reasoning. *Id.*

MCM is not entitled to the bona fide error defense because it has not identified any qualifying clerical or factual error that resulted in its FDCPA violation. A qualifying error would have occurred if, for example, MCM lost Clanton's letter before opening it, or if although MCM read the letter, it somehow missed the sentence disputing Clanton's debt. *See Evans*, 889 F.3d at 350 ("[A] mistake of fact would have occurred if, for example, PRA lost the Letters before opening them or did not actually read the language disputing the debt.") But MCM alleges nothing of the sort. Rather, undisputed record evidence shows that MCM was on notice of Clanton's dispute when it relayed incomplete information about her account to TransUnion. MCM does not even argue that its failure to update the credit reporting list emerged from a clerical or factual error; indeed, MCM stresses that its system was working fully as intended. That recently-received dispute letters will be omitted from reports to credit agencies appears to be a known defect of the system MCM designed, not an error that the system is reasonably calculated to prevent. Addressing bona fide error arguments on nearly identical facts, two other courts in this district aptly described the situation as follows: "plaintiff's letter 'fell through the cracks because MCM designed a system with cracks.'" *Valenta v. Midland Funding*, LLC, 2019 WL 1429656, at *5 (N.D.Ill., 2019) (quoting *Francisco v. Midland Funding, LLC*, No. 17 C 6872, 2019 WL 498936, at *5 (N.D. Ill. Feb. 8, 2019)). This does not constitute a bona fide error under Section 1692k(c).

Perhaps acknowledging this, MCM does not purport to identify an error that resulted in its FDCPA violation. Rather, MCM states vaguely that it may assert the bona fide error defense because it "did not intend to violate Plaintiff's FDCPA rights." (MCM's Resp. at 9.) If MCM's argument is that it misinterpreted the FDCPA, and that this qualifies as a bona fide error, it is incorrect. MCM cites *Kort v. Diversified Collection Servs., Inc.*, 394 F.3d 530 (7th Cir. 2005) in support of the proposition that "a debt collector must only show that the violation of the FDCPA was unintentional, not that the *communication itself* was unintentional." (MCM's Resp. at 9.) To the extent *Kort* endorsed the application of the bona fide error defense to misunderstandings of the law, however, it was abrogated by the Supreme Court's holding in *Jerman*. *See Leeb v. Nationwide Credit Corp.*, 806 F.3d 895, 899 n.2 (7th Cir. 2015) (noting that *Kort's* holding was not "that liability is limited to willful violations" and that "after *Jerman*, any dicta to that effect misstates the law"); *Oberg v. Blatt*, No. 14 C 7369, 2015 WL 9478213, at *3 (N.D. Ill. Dec. 29, 2015) ("*Kort* predates *Jerman*, so the continued validity of its central holding is open to question.") The Seventh Circuit interprets *Jerman* to reach "all mistaken interpretations of the Act, regardless of how understandable or reasonable they might have been." *Oliva v. Blatt, Hasenmiller, Leibsker & Moore LLC*, 864 F.3d 492, 498 (7th Cir. 2017), *cert. denied,* 138 S. Ct. 1283 (2018). MCM's misreading of the FDCPA to incorporate a 30-day grace period, therefore, does not entitle it to raise the bona fide error defense. Because there is no evidence from which a reasonable jury could find that MCM's transmission of false information to TransUnion resulted from a factual or clerical error, this court finds as a matter of law that MCM cannot prove the defense of bona fide error.

### D. Unclean Hands

MCM further argues that it should be excused from liability because, it alleges, Plaintiff's Counsel encouraged Clanton to send the dispute letter, knowing that this would lead to the FDCPA violation, so that they could then sue MCM on Clanton's behalf. This, MCM argues, entitles it to assert the affirmative defense of "unclean hands." The only case MCM cites,

14

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, describes the unclean hands defense as "a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief." 324 U.S. 806, 814 (1945). MCM's exclusive reliance on *Precision Instrument* is unsatisfying, both because MCM does not allege that Clanton herself proceeded in bad faith, and because Clanton does not seek equitable relief. However frustrated MCM may be by the many lawsuits brought against it by Plaintiff's counsel, it has not articulated a valid basis for denying relief to Clanton. Other courts in this district, addressing nearly identical arguments, have reached the same conclusion. *E.g. Valenta*, 2019 WL 1429656, at *4 ("there is no unclean hands defense available to debt collectors under the FDCPA"); *Francisco*, 2019 WL 1227791, at *2. On the FDCPA claim, Clanton is entitled to summary judgment against MCM.

### E. Actual Damages

Notwithstanding the issue of liability, MCM asks the court to rule as a matter of law that Clanton is not entitled to actual damages under 15 U.S.C. § 1692k(a)(1). Here MCM is on firmer ground. The only such damages that Clanton claims are for emotional distress, purportedly suffered as a result of MCM's FDCPA violation. (*See* Pl. MCM Reply [70] at 8-9.) The Seventh Circuit "maintain[s] a strict standard for a finding of emotional damage because they are so easy to manufacture." *Ruffin-Thompkins v. Experian Info. Sols., Inc.*, 422 F.3d 603, 609 (7th Cir. 2005) (quoting *Sarver v. Experian Info. Sols.*, 390 F.3d 969, 971 (7th Cir. 2004)). Clanton concedes that generally, in order "to recover for emotional damages, a claimant must establish that there was some 'extreme and outrageous conduct.'" (*Id.* at 8); *see also*, *generally*, Restatement (Third) of Torts § 46 (Am. Law Inst. 2012). Absent facts "so inherently degrading that it would be reasonable to infer that a person would suffer emotional distress from the defendant's actions," a plaintiff whose own "own testimony is the only proof of emotional damages . . . must explain the circumstances of his injury in reasonable detail; he cannot rely on mere conclusory statements." *Denius v. Dunlap*, 330 F.3d 919, 929 (7th Cir. 2003). In *Denius*, for example, the court found that

a plaintiff's bare allegations that he was "embarrassed" and "humiliated" when fired and escorted from a building by security personnel were "insufficient to justify sending the issue [of actual damages] to the jury." *Id.* at 930.

The evidence in the record is similarly inadequate to support Clanton's claim for actual damages. In *Valenta*, a court in this district found that "[t]here is nothing 'inherently degrading' about sending a report to credit bureaus that 'correctly recit[es] the amount of the debt but incorrectly omit[s] that the debt is disputed.'" 2019 WL 1429656, at *6 (quoting *Francisco*, 2019 WL 498936, at *6)). Clanton filed *Valenta* as supplemental authority in this court [81], but does not attempt to distinguish its conclusion; indeed, she expressly concedes that MCM's conduct was "not necessarily extreme." (Pl. MCM Reply at 8.) Clanton cites no authority in which comparable conduct was found to be serious enough to warrant the award of emotional distress damages, and the court is not aware of any.

Nor does Clanton describe her emotional injuries in any significant detail. In her briefing, she characterizes the harm she suffered as "a short temper and other garden variety emotional distress," without any further detail. (*Id.*) Clanton's only evidence of this harm is her declaration, which consists of conclusory statements that she suffered "stress, aggravation, confusion and humiliation" as a result of the inaccurate credit report, and her deposition, in which she claims to suffer a "short temper," which she attributes to phone calls from MCM. These are the sort of "mere conclusory statements" that fail to meet the Seventh Circuit's high bar for claiming emotional distress damages. Perhaps acknowledging this fact, Clanton concludes by asking the court to synthesize a new standard for awarding emotion distress damages that, somehow, permits her recovery. (Pl. MCM Reply [70] at 8.) The court declines to do so, and grants summary judgment in favor of MCM on the issue of actual damages.

## II. ICAA Claim

With regard to Clanton's ICAA claim, Defendants note that federal courts in this district do not recognize a private right of action under the ICAA. *See, e.g., Ali v. Portfolio Recovery Assocs.,*

*LLC*, No. 15-CV-06178, 2018 WL 4760284, at *10 (N.D. Ill. Sept. 30, 2018); *Keys v. Collection Prof'ls, Inc.*, No. 16 C 8452, 2018 WL 1469006, at *7 (N.D. Ill. Mar. 25, 2018); *Skinner v. LVNV Funding, LLC*, No. 16 C 7089, 2018 WL 319320, at *5, (N.D. Ill. Jan. 8, 2018); *Eul v. Transworld Sys.*, No. 15 C 7755, 2017 WL 1178537, at *17 (N.D. Ill. Mar. 30, 2017) ("[N]o Illinois appellate decision before or since [Sherman] has found, applied, or even mentioned an implied private right of action under § 9—or, so far as this Court's research reveals, any other provision of the ICAA."). Because Clanton has not responded to this argument, the court grants Defendants summary judgment as to the ICAA claim.

## **CONCLUSION**

Clanton's motion for summary judgment [38] is granted as to her claim that MCM violated the FDCPA. Defendants' motion for summary judgment [55] is granted to MF on all claims, to MCM on the ICAA claim, and to MCM on the issue of actual damages. As "the FDCPA provides for trial by jury in determining statutory . . . damages," that issue will proceed to trial. *Kobs v. Arrow Serv. Bureau, Inc.*, 134 F.3d 893, 896-99 (7th Cir. 1998). The parties are encouraged to confer regarding settlement.

ENTER:

Dated: September 30, 2019

_____
REBECCA R. PALLMEYER
United States District Judge